## BEER ET AL. *v.* UNITED STATES ET AL.

No. 73–1869.  Argued March 26, 1975—Reargued November 12,
1975—Decided March 30, 1976

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting opinion, *post*, p. 143. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 145. STEVENS, J., took no part in the consideration or decision of the case.

*James R. Stoner* reargued the cause for appellants. With him on the brief were *Blake G. Arata, Ernest L. Salatich, James R. Treese,* and *Ernest L. Ruffner.*

*Deputy Solicitor General Wallace* reargued the cause for the United States. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Pottinger, John P. Rupp, Brian K. Landsberg,* and *Walter W. Barnett. Stanley A. Halpin, Jr.,* reargued the cause for appellees Jackson et al. With him on the briefs were *Jack Greenberg, James M. Nabrit III, Eric Schnapper,* and *Wiley Branton.*

MR. JUSTICE STEWART delivered the opinion of the Court.

Section 5 of the Voting Rights Act of 1965 [1] prohibits

---

[1] Section 5 provides:

"Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b (a) of this title based upon

a State or political subdivision subject to § 4 of the Act [2] from enforcing "any voting qualification or prerequisite to voting, or standard, practice, or procedure with re-

determinations made under the first sentence of section 1973b (b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b (a) of this title based upon determinations made under the second sentence of section 1973b (b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b (a) of this title based upon determinations made under the third sentence of section 1973b (b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b (f) (2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the

spect to voting different from that in force or effect on November 1, 1964," unless it has obtained a declaratory judgment from the District Court for the District of Columbia that such change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or has submitted the proposed change to the Attorney General and the Attorney General has not objected to it. The constitutionality of this procedure was upheld in *South Carolina* v. *Katzenbach*, 383 U. S. 301, and it is now well established that § 5 is applicable when a State or political subdivision adopts a legislative reapportionment plan. *Allen* v. *State Board of Elections*, 393 U. S. 544; *Georgia* v. *United States*, 411 U. S. 526.

The city of New Orleans brought this suit under § 5 seeking a judgment declaring that a reapportionment of New Orleans' councilmanic districts did not have the purpose or effect of denying or abridging the right to vote on account of race or color.[3] The District Court

---

Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court." 79 Stat. 439, as amended, 89 Stat. 402, 404, 42 U. S. C. § 1973c (1970 ed., Supp. V).

[2] 42 U. S. C. § 1973b (1970 ed. and Supp. V). Louisiana and its political subdivisions are subject to the provisions of § 4. 30 Fed. Reg. 9897 (1965).

[3] The action was actually brought on behalf of the city of New Orleans by six of the seven members of its city council. For con-

entered a judgment of dismissal, holding that the new reapportionment plan would have the effect of abridging the voting rights of New Orleans' Negro citizens. 374 F. Supp. 363. The city appealed the judgment to this Court, claiming that the District Court used an incorrect standard in assessing the effect of the reapportionment in this § 5 suit. We noted probable jurisdiction of the appeal. 419 U. S. 822.

I

New Orleans is a city of almost 600,000 people. Some 55% of that population is white and the remaining 45% is Negro. Some 65% of the registered voters are white, and the remaining 35% are Negro.[4] In 1954, New Orleans adopted a mayor-council form of government. Since that time the municipal charter has provided that the city council is to consist of seven members, one to be elected from each of five councilmanic districts, and two to be elected by the voters of the city at large. The 1954 charter also requires an adjustment of the boundaries of the five single-member councilmanic districts following each decennial census to reflect population shifts among the districts.

_____

venience the appellants sometimes are referred to in this opinion as New Orleans or the city.

The defendants in the suit were the United States and the Attorney General of the United States. A group of Negro voters of New Orleans intervened on the side of the defendants in the District Court.

[4] The difference in the two figures is due in part to the fact that proportionately more whites of voting age are registered to vote than are Negroes and in part to the fact that the age structures of the white and Negro populations of New Orleans differ significantly—72.3% of the white population is of voting age, but only 57.1% of the Negro population is of voting age. See U. S. Civil Rights Commission, The Voting Rights Act: Ten Years After, pp. 368, 383.

In 1961, the city council redistricted the city based on the 1960 census figures. That reapportionment plan established four districts that stretched from the edge of Lake Pontchartrain on the north side of the city to the Mississippi River on the city's south side. The fifth district was wedge shaped and encompassed the city's downtown area. In one of these councilmanic districts, Negroes constituted a majority of the population, but only about half of the registered voters. In the other four districts white voters clearly outnumbered Negro voters. No Negro was elected to the New Orleans City Council during the decade from 1960 to 1970.

After receipt of the 1970 census figures the city council adopted a reapportionment plan (Plan I) that continued the basic north-to-south pattern of councilmanic districts combined with a wedge-shaped, downtown district. Under Plan I Negroes constituted a majority of the population in two districts, but they did not make up a majority of registered voters in any district. The largest percentage of Negro voters in a single district under Plan I was 45.2%. When the city submitted Plan I to the Attorney General pursuant to § 5, he objected to it, stating that it appeared to "dilute black voting strength by combining a number of black voters with a larger number of white voters in each of the five districts." He also expressed the view that "the district lines [were not] drawn as they [were] because of any compelling governmental need" and that the district lines did "not reflect numeric population configurations or considerations of district compactness or regularity of shape."

Even before the Attorney General objected to Plan I, the city authorities had commenced work on a second plan—Plan II.[5] That plan followed the general north-

---

[5] The decision to draft a new plan was in large part attributable to the opposition to Plan I expressed by the residents of Algiers—

to-south districting pattern common to the 1961 appor-
tionment and Plan I.[6]   It produced Negro population
majorities in two districts and a Negro voter majority
(52.6%) in one district.   When Plan II was submitted
to the Attorney General, he posed the same objections
to it that he had raised to Plan I.   In addition, he noted
that "the predominantly black neighborhoods in the city
are located generally in an east to west progression," and
pointed out that the use of north-to-south districts in
such a situation almost inevitably would have the effect
of diluting the maximum potential impact of the Negro
vote.   Following the rejection by the Attorney General
of Plan II, the city brought this declaratory judgment
action in the United States District Court for the Dis-
trict of Columbia.

The District Court concluded that Plan II would have
the effect of abridging the right to vote on account of
race or color.[7]   It calculated that if Negroes could elect
city councilmen in proportion to their share of the city's
registered voters, they would be able to choose 2.42 of
the city's seven councilmen, and, if in proportion to their
share of the city's population, to choose 3.15 council-
men.[8]   But under Plan II the District Court concluded

---

that part of New Orleans located south of the Mississippi River.
The residents of Algiers have a common interest in promoting the
construction of an additional bridge across the river.   They had
always been represented by one councilman, and they opposed
Plan I primarily because it divided Algiers among three council-
manic districts.

[6] The opposition to Plan I in Algiers, see n. 5, *supra*, was quieted
in Plan II by placing all of that section of the city in one council-
manic district.

[7] The District Court did not address the question whether Plan II
was adopted with such a "purpose."   See n. 1, *supra*.

[8] This Court has, of course, rejected the proposition that members
of a minority group have a federal right to be represented in legisla-

that, since New Orleans' elections had been marked by bloc voting along racial lines, Negroes would probably be able to elect only one councilman—the candidate from the one councilmanic district in which a majority of the voters were Negroes. This difference between mathematical potential and predicted. reality was such that "the burden in the case at bar was at least to demonstrate that nothing but the redistricting proposed by Plan II was feasible." 374 F. Supp., at 393. The court concluded that "[t]he City has not made that sort of demonstration; indeed, it was conceded at trial that neither that plan nor any of its variations was the City's sole available alternative." *Ibid.*[9]

As a separate and independent ground for rejecting Plan II, the District Court held that the failure of the plan to alter the city charter provision establishing two at-large seats had the effect in itself of "abridging the right to vote . . . on account of race or color." As the court put it: "[T]he City has not supported the choice of at-large elections by any consideration which would sat-

_____

tive bodies in proportion to their number in the general population. See *Whitcomb* v. *Chavis*, 403 U. S. 124, 149. It is worth noting, however, that had the District Court applied its mathematical calculations to the five seats that were properly subject to its scrutiny, see Part II–A of text, *infra,* it would have concluded on the basis of registered voter figures that Negroes in New Orleans had a theoretical potential of electing 1.7 of the five councilmen. A realistic prediction would seem to be that under the actual operation of Plan II at least one and perhaps two Negro councilmen would in fact be elected. See *infra,* at 142.

[9] At various points in its 40-page opinion the District Court described its understanding of the statutory criteria in terms somewhat different from those quoted in the text above. Since, as will hereafter appear, our understanding of the meaning of § 5 does not in any event coincide with that of the District Court, no purpose would be served by isolating and separately examining the various verbalizations of the statutory criteria contained in its opinion.

isfy the standard of compelling governmental interest, or the need to demonstrate the improbability of its realization through the use of single-member districts. These evaluations compel the conclusion that the feature of the city's electoral scheme by which two councilmen are selected at large has the effect of impermissibly minimizing the vote of its black citizens; and the further conclusion that for this additional reason the city's redistricting plan does not pass muster." *Id.*, at 402. (Footnotes omitted.)

The District Court therefore refused to allow Plan II to go into effect. As a result there have been no councilmanic elections in New Orleans since 1970, and the councilmen elected at that time (or their appointed successors) have remained in office ever since.

## II

### A

The appellants urge, and the United States on reargument of this case has conceded, that the District Court was mistaken in holding that Plan II could be rejected under § 5 solely because it did not eliminate the two at-large councilmanic seats that had existed since 1954. The appellants and the United States are correct in their interpretation of the statute in this regard.

The language of § 5 clearly provides that it applies only to proposed changes in voting procedures. "[D]iscriminatory practices . . . instituted prior to November 1964 . . . are not subject to the requirement of preclearance [under § 5]." U. S. Commission on Civil Rights, The Voting Rights Act: Ten Years After, p. 347. The ordinance that adopted Plan II made no reference to the at-large councilmanic seats. Indeed, since those seats had been established in 1954 by the city charter, an ordinance could not have altered them; any change in

the charter would have required approval by the city's voters. The at-large seats, having existed without change since 1954, were not subject to review in this proceeding under § 5.[10]

## B

The principal argument made by the appellants in this Court is that the District Court erred in concluding that the makeup of the five geographic councilmanic districts under Plan II would have the effect of abridging voting rights on account of race or color. In evaluating this claim it is important to note at the outset that the question is not one of constitutional law, but of statutory construction.[11] A determination of when a legislative reapportionment has "the effect of denying or abridging the right to vote on account of race or color," must depend, therefore, upon the intent of

---

[10] In reaching this conclusion, we do not decide the question reserved in *Georgia* v. *United States*, 411 U. S. 526, 535 n. 7, whether a district in a proposed legislative reapportionment plan that is identical to a district in the previously existing apportionment may be subject to review under § 5. The at-large seats in the present case were not even part of the 1961 plan, let alone of Plan II.

[11] This Court has not before dealt with the question of what criteria a legislative reapportionment plan must satisfy under § 5. Last Term in *City of Richmond* v. *United States*, 422 U. S. 358, the Court had to decide under what circumstances § 5 would permit a city to annex additional territory when that annexation would have the effect of changing the city's Negro population from a majority into a minority. The Court held that the annexation should be approved under the "effect" aspect of § 5 if the system for electing councilmen would likely produce results that "fairly reflect[ed] the strength of the Negro community as it exists after the annexation." 422 U. S., at 371. The *City of Richmond* case thus decided when a change with an adverse impact on previous Negro voting power met the "effect" standard of § 5. The present case, by contrast, involves a change with no such adverse impact upon the former voting power of Negroes.

140

Congress in enacting the Voting Rights Act and specifically § 5.

The legislative history reveals that the basic purpose of Congress in enacting the Voting Rights Act was "to rid the country of racial discrimination in voting." *South Carolina* v. *Katzenbach*, 383 U. S., at 315. Section 5 was intended to play an important role in achieving that goal:

> "Section 5 was a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down. That practice had been possible because each new law remained in effect until the Justice Department or private plaintiffs were able to sustain the burden of proving that the new law, too, was discriminatory. . . . Congress therefore decided, as the Supreme Court held it could, 'to shift the advantage of time and inertia from the perpetrators of the evil to its victim,' by 'freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory.' " H. R. Rep. No. 94–196, pp. 57–58. (Footnotes omitted.)

See also H. R. Rep. No. 439, 89th Cong., 1st Sess., 9–11, 26; S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, pp. 6–9, 24; H. R. Rep. No. 91–397, pp. 6–8; H. R. Rep. No. 94–196, pp. 8–11, 57–60; S. Rep. No. 94–295, pp. 15–19; *South Carolina* v. *Katzenbach, supra,* at 335.

By prohibiting the enforcement of a voting-procedure change until it has been demonstrated to the United States Department of Justice or to a three-judge federal court that the change does not have a discriminatory effect, Congress desired to prevent States from "undo-[ing] or defeat[ing] the rights recently won" by Negroes. H. R. Rep. No. 91–397, p. 8. Section 5 was intended

"to insure that [the gains thus far achieved in minority political participation] shall not be destroyed through new [discriminatory] procedures and techniques." S. Rep. No. 94–295, p. 19.

When it adopted a 7-year extension of the Voting Rights Act in 1975, Congress explicitly stated that "the standard [under § 5] can only be fully satisfied by determining on the basis of the facts found by the Attorney General [or the District Court] to be true whether the ability of minority groups to participate in the political process and to elect their choices to office is *augmented, diminished, or not affected* by the change affecting voting . . . ." H. R. Rep. No. 94–196, p. 60 (emphasis added).[12] In other words the purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.

It is thus apparent that a legislative reapportionment that enhances the position of racial minorities with respect to their effective exercise of the electoral franchise can hardly have the "effect" of diluting or abridging the right to vote on account of race within the meaning of § 5. We conclude, therefore, that such an ameliorative new legislative apportionment cannot violate § 5 unless the new apportionment itself so discriminates on the basis of race or color as to violate the Constitution.

The application of this standard to the facts of the present case is straightforward. Under the apportionment of 1961 none of the five councilmanic districts had a clear Negro majority of registered voters, and no Negro

---

[12] Cf. MR. JUSTICE BRENNAN's dissenting opinion in *City of Richmond* v. *United States, supra,* at 388: "I take to be the fundamental objective of § 5 . . . the protection of *present* levels of voting effectiveness for the black population." (Emphasis in original.)

has been elected to the New Orleans City Council while that apportionment system has been in effect. Under Plan II, by contrast, Negroes will constitute a majority of the population in two of the five districts and a clear majority of the registered voters in one of them. Thus, there is every reason to predict, upon the District Court's hypothesis of bloc voting, that at least one and perhaps two Negroes may well be elected to the council under Plan II.[13] It was therefore error for the District Court to conclude that Plan II "will . . . have the effect of denying or abridging the right to vote on account of race or color" within the meaning of § 5 of the Voting Rights Act.[14]

---

[13] The intervenors have advised us of statistics indicating that as of 1974, the percentage of Negro registered voters in the city as a whole increased to 38.2%. Assuming the accuracy of these estimates, and that the increase has been proportionate in each councilmanic district, it is quite possible that by this time not only a majority of the population but also a majority of the registered voters in two of the Plan II districts are Negroes. See Taylor v. McKeithen, 499 F. 2d 893, 896 (CA5).

[14] It is possible that a legislative reapportionment could be a substantial improvement over its predecessor in terms of lessening racial discrimination, and yet nonetheless continue so to discriminate on the basis of race or color as to be unconstitutional. The United States has made no claim that Plan II suffers from any such disability, nor could it rationally do so.

There is no decision in this Court holding a legislative apportionment or reapportionment violative of the Fifteenth Amendment. Cf. Wright v. Rockefeller, 376 U. S. 52. The case closest to so holding is Gomillion v. Lightfoot, 364 U. S. 339, in which the Court found that allegations of racially motivated gerrymandering of a municipality's political boundaries stated a claim under that Amendment. The many cases in this Court involving the Fourteenth Amendment's "one man, one vote" standard are not relevant here. See Reynolds v. Sims, 377 U. S. 533. But in at least four cases the Court has considered claims that legislative apportionments violated the Fourteenth Amendment rights of identifiable racial or ethnic minorities. See Fortson v. Dorsey, 379 U. S. 433, 439; Burns v. Richardson, 384 U. S. 73, 86–89; Whitcomb v. Chavis,

Accordingly, the judgment of the District Court is vacated, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Stevens took no part in the consideration or decision of this case.

Mr. Justice White, dissenting.

With Mr. Justice Marshall, I cannot agree that § 5 of the Voting Rights Act of 1965 reaches only those changes in election procedures that are more burdensome to the complaining minority than pre-existing procedures. As I understand § 5, the validity of *any* procedural change otherwise within the reach of the section must be determined under the statutory standard—whether the proposed legislation has the purpose or effect of abridging or denying the right to vote based on race or color.

This statutory standard is to be applied here in light of the District Court's findings, which are supported by the evidence and are not now questioned by the Court. The findings were that the nominating process in New Orleans' councilmanic elections is subject to majority vote and "anti-single-shot" rules and that there is a history of bloc racial voting in New Orleans, the predictable result being that no Negro candidate will win in any district in which his race is in the minority. In my view, where these facts exist, combined with a segregated residential pattern, § 5 is not satisfied unless, to the extent practicable, the new electoral districts afford the Negro minority the opportunity to achieve legislative representation roughly proportional to the Negro population

---

403 U. S. 124, 149; *White* v. *Regester,* 412 U. S. 755. Plan II does not remotely approach a violation of the constitutional standards enunciated in those cases.

in the community. Here, with a seven-member city council, the black minority constituting approximately 45% of the population of New Orleans, would be entitled under § 5, as I construe it, to the opportunity of electing at least three city councilmen—more than provided by the plan at issue here.

Bloc racial voting is an unfortunate phenomenon, but we are repeatedly faced with the findings of knowledgeable district courts that it is a fact of life. Where it exists, most often the result is that neither white nor black can be elected from a district in which his race is in the minority. As I see it, Congress has the power to minimize the effects of racial voting, particularly where it occurs in the context of other electoral rules operating to muffle the political potential of the minority. I am also satisfied that § 5 was aimed at this end, among others, and should be so construed and applied. See *City of Richmond* v. *United States,* 422 U. S. 358, 370–372 (1975).

Minimizing the exclusionary effects of racial voting is possible here because whites and blacks are not scattered evenly throughout the city; to a great extent, each race is concentrated in identifiable areas of New Orleans. But like bloc voting by race, this too is a fact of life, well known to those responsible for drawing electoral district lines. These lawmakers are quite aware that the districts they create will have a white or a black majority; and with each new district comes the unavoidable choice as to the racial composition of the district. It is here that § 5 intervenes to control these choices to the extent necessary to afford the minority the opportunity of achieving fair representation in the legislative body in question.

Applying § 5 in this way would at times require the drawing of district lines based on race; but Congress has this power where deliberate discrimination at the polls

and the relevant electoral laws and customs have effectively foreclosed Negroes from enjoying a modicum of fair representation in the city council or other legislative body.

Since Plan II at issue in this case falls short of satisfying § 5 and since I agree with MR. JUSTICE MARSHALL that the city has failed to present sufficiently substantial justifications for its proposal, I respectfully dissent and would affirm the judgment of the District Court.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

Over the past 10 years the Court has, again and again, read the jurisdiction of § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 89 Stat. 402, 404, 42 U. S. C. § 1973c (1970 ed., Supp. V), expansively so as "to give the Act the broadest possible scope" and to reach "any state enactment which altered the election law of a covered State in even a minor way." *Allen* v. *State Board of Elections,* 393 U. S. 544, 567, 566 (1969). See also *Georgia* v. *United States,* 411 U. S. 526 (1973); *Perkins* v. *Matthews,* 400 U. S. 379 (1971); *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966). While we have settled the contours of § 5's jurisdiction, however, we have yet to devote much attention to defining § 5's substantive force within those bounds. Thus, we are faced today for the first time with the question of § 5's substantive application to a redistricting plan. Essentially, we must answer one question: When does a redistricting plan have the effect of "abridging" the right to vote on account of race or color?

The Court never answers this question. Instead, it produces a convoluted construction of the statute that transforms the single question suggested by § 5 into three questions, and then provides precious little guidance in answering any of them.

Under the Court's reading of § 5, we cannot reach the abridgment question unless we have first determined that a proposed redistricting plan would "lead to a retrogression in the position of racial minorities," *ante,* at 141, in comparison to their position under the existing plan. The Court's conclusion that § 5 demands this preliminary inquiry is simply wrong; it finds no support in the language of the statute and disserves the legislative purposes behind § 5.

Implicitly admitting as much, the Court adds another question, this one to be asked if the proposed plan is not "retrogressive": whether "the new apportionment itself so discriminates on the basis of race or color as to violate the Constitution." *Ante,* at 141. This addition does much—in theory, at least—to salvage the Court's test, since our decisions make clear that the proper test of abridgment under § 5 is essentially the constitutional inquiry.

Still, I cannot accept the Court's awkward construction. Not only is the Court's multiple-step inquiry unduly cumbersome and an unnecessary burden to place upon the Attorney General and the District Court for the District of Columbia, but the Court dilutes the meaning of unconstitutionality in this context to the point that the congressional purposes in § 5 are no longer served and the sacred guarantees of the Fourteenth and Fifteenth Amendments emerge badly battered. And in the process, the Court approves a blatantly discriminatory districting plan for the city of New Orleans. I dissent.

## I

### A

The Fifteenth Amendment provides:

"The right of citizens of the United States to vote shall not be denied or abridged by the United States

or by any State on account of race, color, or previous condition of servitude." U. S. Const., Amdt. 15, § 1.

Although the Amendment is self-enforcing, litigation to secure the rights it guarantees proved time consuming and ineffective, while the will of those who resisted its command was strong and unwavering. Finally Congress decided to intervene. In 1965 it enacted the Voting Rights Act, designed "to rid the country of racial discrimination in voting." *South Carolina* v. *Katzenbach,* 383 U. S., at 315. See also *id.,* at 308–315. The Act proclaims that its purpose is "to enforce the fifteenth amendment to the Constitution . . . ," 79 Stat. 437; the heart of its enforcement mechanism is § 5. In language that tracks that of the Fifteenth Amendment, § 5 declares that no State covered by the Act shall enforce any plan with respect to voting different from that in effect on November 1, 1964, unless the Attorney General or a three-judge District Court in the District of Columbia declares that such plan

"does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color . . . ." 42 U. S. C. § 1973c (1970 ed., Supp. V).[1]

While the substantive reach of § 5 is somewhat broader than that of the Fifteenth Amendment in at least one regard—the burden of proof is shifted from discriminatee

---

[1] Section 5 actually requires that "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" different from that in effect on November 1, 1964, be approved by the Attorney General or the District Court for the District of Columbia. 42 U. S. C. § 1973c (1970 ed., Supp. V). We have held that a redistricting plan is a "standard, practice, or procedure with respect to voting" within the meaning of § 5. *Georgia* v. *United States,* 411 U. S. 526 (1973).

to discriminator[2]—§ 5 is undoubtedly tied to the standards of the Constitution.[3] Thus, it is questionable whether the "purpose and effect" language states anything more than the constitutional standard,[4] and it is

---

[2] We upheld the validity of the shifted burden of proof in *South Carolina* v. *Katzenbach*, 383 U. S. 301, 335 (1966).

[3] "The Act suspends new voting regulations pending scrutiny by federal authorities to determine whether their use would violate the Fifteenth Amendment." *Id.*, at 334.

[4] The Court's decisions relating to the relevance of purpose-and/or-effect analysis in testing the constitutionality of legislative enactments are somewhat less than a seamless web. The possible theoretical approaches are three: (1) purpose alone is the test of unconstitutionality, and effect is irrelevant, or relevant only insofar as it sheds light on purpose; (2) effect alone is the test, and purpose is irrelevant; and (3) purpose or effect, either alone or in combination, is sufficient to show unconstitutionality. At various times in recent years the Court has seemed to adopt each of these approaches.

In the two Fifteenth Amendment redistricting cases, *Wright* v. *Rockefeller*, 376 U. S. 52 (1964), and *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960), the Court suggested that legislative purpose alone is determinative, although language in both cases may be isolated that seems to approve some inquiry into effect insofar as it elucidates purpose. See 376 U. S., at 52; 364 U. S., at 341. See also 376 U. S., at 73–74 (Goldberg, J., dissenting). *McGowan* v. *Maryland*, 366 U. S. 420, 453 (1961), an equal protection-First Amendment case, expressly states that effect is of relevance in imputing an improper purpose, but that legislation is invalidated only for having such a purpose. And *City of Richmond* v. *United States*, 422 U. S. 358, 378–379 (1975), suggests that bad purpose may invalidate a law under the Fifteenth Amendment even if there is no unconstitutional effect at all.

Completely contrary to these cases are those that hold that legislative purpose is wholly irrelevant to the constitutionality of legislation—indeed, that purpose may not be examined at all—and that a statute may be invalidated only if it has an unconstitutional effect. *Palmer* v. *Thompson*, 403 U. S. 217, 224–225 (1971), and *United States* v. *O'Brien*, 391 U. S. 367, 384–385 (1968), both vigorously

clear that the "denying or abridging" phrase does no more than directly adopt the language of the Fifteenth Amendment.

In justifying its convoluted construction of § 5, however, the Court never deals with the fact that, by its plain language, § 5 does no more than adopt, or arguably expand,[5] the constitutional standard. Since it has never

---

attack purpose analysis and assert that *Gomillion* was decided as it was only because the statute in question had an unlawful effect.

Between these two positions are the cases that hold that either an impermissible purpose or an impermissible effect may alone be sufficient to invalidate a law. *Board of Education* v. *Allen*, 392 U. S. 236, 243 (1968); *Abington School District* v. *Schempp*, 374 U. S. 203, 222 (1963). While there is no need here to synthesize these three positions and the various cases, if indeed a synthesis is possible, it should be clear that the language of purpose and effect selected by Congress for use in § 5 is not necessarily an expansion of the constitutional standard. Congress did no more than adopt the third of the tests that the Court itself has juggled over the years, See generally Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L. J. 1205 (1970).

[5] We have recognized that § 5 of the Fourteenth Amendment gives Congress the power to expand the substantive reach of that Amendment. *Katzenbach* v. *Morgan*, 384 U. S. 641 (1966). Undoubtedly, § 2 of the Fifteenth Amendment, under which the Voting Rights Act was enacted, confers similar power upon Congress with respect to the substantive reach of the Fifteenth Amendment. Thus, to the extent, if any, that analysis for purpose or for effect is not independently required for resolution of the constitutional question, see n. 4, *supra,* Congress may be said to have expanded the constitutional inquiry in § 5 of the Voting Rights Act. Insofar as redistricting legislation is concerned, however, I believe a showing of purpose or of effect is alone sufficient to demonstate unconstitutionality, and so I believe that in this context Congress enacted no more than the constitutional standard. Evaluation of the purpose of a legislative enactment is just too ambiguous a task to be the sole tool of constitutional analysis. See *Palmer* v. *Thompson, supra,* at 224–225; *United States* v. *O'Brien, supra,* at 384–385. Therefore, a demonstration of effect ordinarily should suffice. If,

been held, or even suggested, that the constitutional standard requires an inquiry into whether a redistricting plan is "ameliorative" or "retrogressive," *a fortiori* there is no basis for so reading § 5. While the Court attempts to provide a basis by relying on the asserted purpose of § 5—to preserve present Negro voting strength [6]—it is wholly unsuccessful. What superficial credibility the argument musters is achieved by ignoring not only the statutory language, but also at least three other purposes behind § 5.[7]

---

of course, purpose may conclusively be shown, it too should be sufficient to demonstrate a statute's unconstitutionality.

[6] While the Court does quote language that suggests some of the other purposes that I see in the statute, *ante,* at 140, when it comes to giving substantive content to § 5, the Court relies solely on the purpose suggested in the text.

It may be that this single purpose looms so large to the Court because it thinks it would be counterproductive to bar enforcement of a proposed plan, even if discriminatory, that is at all less discriminatory than the pre-existing plan, which would otherwise remain frozen in effect. While this argument has superficial appeal, it is ultimately unrealistic because it will be a rare jurisdiction that can retain its pre-existing apportionment after the rejection of a modification by the Attorney General or District Court. Jurisdictions do not undertake redistricting without reason. In this case, for instance, the New Orleans City Charter requires redistricting every 10 years. If the plan before us now were disapproved, New Orleans would have to produce a new one or amend its charter. In other cases, redistricting will have been constitutionally compelled by our one-person, one-vote decisions. *Reynolds* v. *Sims,* 377 U. S. 533 (1964). The virtual necessity of prompt redistricting argues strongly in favor of rejecting "ameliorative" but still discriminatory redistricting plans. The jurisdictions will eventually have to return with a nondiscriminatory plan.

[7] Equally unsuccessful is the Court's attempt to paint the "ameliorative" changes in this case as dramatic. Negroes constitute 45% of the population of New Orleans and 34.5% of the city's registered

Thus, the legislative history of the Voting Rights Act makes clear, and the Court assiduously ignores, that § 5 was designed to preclude new districting plans that "perpetuate discrimination,"[8] to prevent covered jurisdictions

---

voters. Under the 1961 redistricting plan currently in effect in New Orleans, that population is distributed as follows:

| District | Population % Negro | Registered Voters % Negro |
|---|---|---|
| A | 31.6 | 22.7 |
| B | 62.2 | 50.2 |
| C | 40.2 | 24.6 |
| D | 43.7 | 36.3 |
| E | 49.4 | 42.8 |

App. 621. Under Plan II, which is at issue in this lawsuit, the same population is distributed in this manner:

| District | Population % Negro | Registered Voters % Negro |
|---|---|---|
| A | 29.1 | 22.6 |
| B | 64.1 | 52.6 |
| C | 35.8 | 23.3 |
| D | 43.5 | 36.8 |
| E | 50.6 | 43.2 |

App. 624.

Thus the positive change that convinces the Court that no inquiry into possible "abridgment" is necessary is the change from a majority of registered voters in District B of 50.2% (which the Court fails to mention) to what the Court calls a "clear" majority (although the Court has no idea what percentage of registered Negro voters actually vote) in that district of 52.6%. The Court also emphasizes that now Negroes constitute a majority of the population in two districts, whereas under the existing plan they are a majority in only one district. This beneficial change is accomplished by the shift from a minority of 49.4% of the population in District E to a majority in that district of 50.6%.

[8] H. R. Rep. No. 91–397, pp. 6–7 (1969). See also H. R. Rep. No. 439, 89th Cong., 1st Sess., 10–11 (1965); S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, pp. 8, 12 (1965); *South Carolina* v. *Katzenbach*, 383 U. S., at 315–316, 335.

from "circumventing the guarantees of the 15th amendment" by switching to new, and discriminatory, districting plans the moment litigants appear on the verge of having an existing one declared unconstitutional,[9] and promptly to end discrimination in voting by pressuring covered jurisdictions to remove all vestiges of discrimination from their enactments before submitting them for preclearance.[10] None of these purposes is furthered by an inquiry into whether a proposed districting plan is "ameliorative" or "retrogressive." Indeed, the statement of these purposes is alone sufficient to demonstrate the error of the Court's construction.

---

[9] S. Rep. No. 94–295, p. 15 (1975). See also H. R. Rep. No. 439, *supra*, at 10–11. It is for this reason that the existing plan remains "frozen" in effect while the proposed plan is submitted for approval. Thus, any constitutional litigation may proceed without interruption, unless the new plan is itself found to be nondiscriminatory and is substituted. See H. R. Rep. No. 94–196, p. 58 (1975). Either way, the litigant obtains the relief he seeks—a nondiscriminatory apportionment.

[10] The pressure of having proposed plans judged by rigorous standards and the fear of litigation over new plans were thought to encourage covered jurisdictions to end all discrimination in voting. "The preclearance procedure—and this is critical—serves psychologically to control the proliferation of discriminatory laws and practices because each change must first be federally reviewed. Thus section 5 serves to prevent discrimination before it starts." 115 Cong. Rec. 38486 (1969) (remarks of Rep. McCulloch).

See also *id.*, at 38517 (remarks of Rep. Anderson); U. S. Commission on Civil Rights, The Voting Rights Act: Ten Years After, pp. 30–31 (1975).

The Act's limited term is proof that Congress intended to secure prompt, and not gradual, relief. Originally, the Act was intended to be in effect for only five years. While it has been twice extended, each extension was also for only a few years: five more years in 1970, and seven more years in 1975. Thus, it cannot be argued that the Act contemplated slow forward movement, which the Court's construction sanctifies, rather than a quick remedial "fix."

All the purposes of the statute are met, however, by the inquiry § 5's language plainly contemplates: whether, in absolute terms, the covered jurisdiction can show that its proposed plan meets the constitutional standard. Because it is consistent with both the statutory language and the legislative purposes, this is the proper construction of the provision. Thus, it is the effect of the plan itself, rather than the effect of the change in plans, that should be at issue in a § 5 proceeding.[11]

Ultimately, the Court admits as much by adding an inquiry into whether the proposed plan, even if "ameliorative," is constitutional. After this admission, I cannot understand why the Court bothers at all with its preliminary inquiry into the nature of the change of plans, since the inquiry not only adds nothing, but will, I fear, prove to be a time-consuming distraction from the important business of assessing the constitutionality of the proposed plan.[12] Except for this unnecessary step, how-

---

[11] While I read "abridge" in both § 5 and the Fifteenth Amendment as primarily involving an absolute assessment of dilution of Negro voting power from its potential, I do not hold that recognition of a relative change is absolutely irrelevant to this determination. For instance, it may often be useful to glean some indication of purpose from a minority's relative position under the existing and proposed plans. Moreover, there will be circumstances—annexations, for example—where dilution can fairly be measured only in comparison to the prior scheme. See *City of Richmond* v. *United States*, 422 U. S., at 378. Cf. *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960).

[12] Today the Court finds it simple to conclude that Plan II is "ameliorative," but it will not always be so easy to determine whether a new plan increases or decreases Negro voting power relative to the prior plan. To the contrary, I believe the Court's test will prove unduly difficult of application and excessively demanding of judicial energies.

For instance, the Court today finds that an increase in the size of the Negro majority in one district, with a concomitant increased likelihood of electing a delegate, conclusively shows that Plan II

ever, the Court's final reading of the statute, on its face, no more than duplicates my own.[13]   Nonetheless, I still do not accept the Court's approach.   After properly re-

is ameliorative. Will that always be so? Is it not as common for minorities to be gerrymandered into the same district as into separate ones? Is an increase in the size of an existing majority ameliorative or retrogressive? When the size of the majority increases in one district, Negro voting strength necessarily declines elsewhere. Is that decline retrogressive? Assuming that the shift from a 50.2% to a 52.6% majority in District B in this case is ameliorative, and is not outweighed by the simultaneous decrease in Negro voting strength in Districts A and C, when would an increase become retrogressive? As soon as the majority becomes "safe"? When the majority is achieved by dividing pre-existing concentrations of Negro voters?

Moreover, the Court implies, *ante,* at 139 n. 11, by its attempt to harmonize its holding today with *City of Richmond* v. *United States, supra,* that this preliminary inquiry into the nature of the change is the proper approach to all § 5 cases. The Court's test will prove even more difficult of application outside the redistricting context. Some changes just do not lend themselves to comparison in positive or negative terms; others will always seem negative—or positive—no matter how good or bad the result. For instance, when a city goes from an appointed town manager to an elected council form of government, can the change ever be termed retrogressive, even if the new council is elected at large and Negroes are a minority? Or where a jurisdiction in which Negroes are a substantial minority switches from at-large to ward voting, can that change ever constitute a negative change, no matter how badly the wards are gerrymandered?

I realize, of course, that determining the ultimate question of "abridgment" may involve answering questions similar to those I have posed above and that those questions will be just as difficult to answer. My point, however, is exactly that the inquiry is a difficult one, and that there is no reason substantially to compound that complexity by posing an unnecessary and equally complex preliminary inquiry.

[13] As I understand it, the Court views the constitutional inquiry as part of the § 5 inquiry. See *ante,* at 141. Thus, the burden of proof on constitutional issues, as on all § 5 issues, is on the covered jurisdiction. Although the Court's treatment of the point is

turning the constitutional inquiry to the § 5 proceeding, the Court inexplicably tosses off the question in a footnote, and never undertakes the analysis that both our constitutional cases and our § 5 cases have demanded.[14] This ultimate denigration of the constitutional standard is a result far short of the promise Congress held out in

ambiguous, I read its observation that "[t]he United States has made no claim" that Plan II is unconstitutional, *ante*, at 142 n. 14, as indicating only that it is for the United States to raise the issue of unconstitutionality in the § 5 proceeding, and not as suggesting that, once the issue is raised, the United States must prove the claim as well. Any other reading would frustrate still another legislative purpose. The Act freezes the existing plan and places the burden of proof on the covered jurisdiction to justify the proposed plan expressly in order "to shift the advantage of time and inertia from the perpetrators of the evil to its victims." *South Carolina* v. *Katzenbach*, 383 U. S., at 328. See also H. R. Rep. No. 94–196, p. 58 (1975). I do not understand the Court, in bringing the constitutional issue in through the back door, to eliminate the primary procedural advantage to the United States of the § 5 proceeding.

[14] The Court's treatment of the constitutional questions is all the more puzzling if it intends to confine its constitutional analysis to those seats brought before the District Court in the § 5 proceeding. In this case, the Court holds that it may avoid looking at the two at-large seats on the New Orleans City Council in deciding the § 5 claim, but see *infra*, at 158–159, and its exclusion of those seats appears to extend to its ultimate constitutional inquiry as well. Yet, it is obvious that an independent constitutional challenge to Plan II would also include a challenge to the at-large seats and that such a broadened attack would be considerably more difficult to reject than the question the Court evidently considers. The change in focus caused by an expanded challenge both accentuates the dilution of the Negro vote in New Orleans, see n. 19, *infra*, and necessitates recognition of the particularly dilutive effects of at-large districting schemes. See *White* v. *Regester*, 412 U. S. 755 (1973). If the Court has ignored these factors in finding Plan II constitutional, it has engaged in no more than a time-consuming hypothetical adjudication, for its holding will surely not bar a future constitutional challenge to the entire scheme.

enacting, and re-enacting, the Voting Rights Act, and it is one in which I cannot join.

## B

The proper test in § 5 redistricting cases is preordained by our prior cases, which are ignored today by the Court. As suggested above, we have repeatedly recognized the relevance of constitutional standards to the proper construction of § 5. Thus, we have held that in passing that provision " 'Congress intended to adopt the concept of voting articulated in *Reynolds* v. *Sims,* 377 U. S. 533 (1964), and protect Negroes against a dilution of their voting power.' " *Perkins* v. *Matthews,* 400 U. S., at 390, quoting *Allen* v. *State Board of Elections,* 393 U. S., at 588 (opinion of Harlan, J.). See also *Georgia* v. *United States,* 411 U. S., at 532–533; *Allen* v. *State Board of Elections, supra,* at 565–566, 569.[15] In the Fourteenth Amendment *Reynolds* line of cases, we have made clear that dilution of voting power refers to resulting voting strength that is something less

---

[15] Because I read § 5 as incorporating the standards of the Fifteenth Amendment, see nn. 4–5, *supra,* I read these cases as holding, implicitly, that the Fourteenth and Fifteenth Amendments mandate the same test for assessing the validity, on racial grounds, of legislative apportionments. Since a person whose right to vote is denied or abridged on account of race is likewise denied equal protection of the laws, borrowing from the developed corpus of Fourteenth Amendment law is entirely appropriate.

Seeking another source for a § 5 test is particularly appropriate given the scarcity of Fifteenth Amendment case law. *Wright* v. *Rockefeller,* 376 U. S. 52 (1964), and *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960), the only relevant Fifteenth Amendment cases, predate not only the Voting Rights Act, its incorporation of the language of the Fifteenth Amendment, and our cases construing that incorporation, but also all the Fourteenth Amendment developments discussed in the text. For these reasons, and because neither case states a general test, *Wright* and *Gomillion* are of no help at all in formulating a test for § 5 cases.

than potential (*i. e.,* proportional) power, not to a reduction of existing power. *White* v. *Regester,* 412 U. S. 755, 765–766 (1973); *Whitcomb* v. *Chavis,* 403 U. S. 124, 149 (1971). Nonetheless, we have also acknowledged that a showing of less than proportional representation of Negroes by Negro-elected representatives is not alone sufficient to prove unconstitutional dilution:

> "To sustain such claims [of dilution], it is not enough that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential. The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." *White* v. *Regester, supra,* at 765–766.

See also *Whitcomb* v. *Chavis, supra,* at 149.[16]

It is this constitutionally based concept of dilution that we have held to govern in § 5 proceedings. The concept may be readily transferred to the § 5 context simply by adjusting for the shifted burden of proof. Thus, if the proposed redistricting plan underrepresents minority group members, the burden is on the covered

---

[16] The Court refers to the cited page for the proposition that members of a minority group have no federal right "to be represented in legislative bodies in proportion to their number in the general population." *Ante,* at 136–137, n. 8. *Whitcomb* v. *Chavis* stands for no such proposition. The language the Court refers to is substantively identical to that quoted in the text and supports only the notion that there is no right to proportional representation absent evidence of denial of access to the political process.

jurisdiction to show that "the political processes leading to nomination and election were . . . equally open to participation by the group in question."[17] If the jurisdiction cannot make such a showing, then the proposed plan must be rejected, unless compelling reasons for its adoption can be demonstrated.[18]

## II

.Application of these standards to the case before us is straightforward. Preliminarily, while I agree with the Court that the two at-large seats on the New Orleans City Council are not themselves before the Court for approval and cannot serve as an independent basis for the rejection of Plan II, I do not think Plan II should be assessed without regard to the seven-member council it is designed to fill. Proportional representation of Negroes among the five district seats on the council does not assure Negroes proportional representation on the entire council when, as the District Court found, the two at-large seats will be occupied by white-elected mem-

---

[17] The cases make clear that the inquiry is not meant to be limited to the ability of the minority group to participate in the voting plan under attack, but also includes sweeping analysis of the minority group's past and present treatment by the jurisdiction before the court. *White* v. *Regester*, 412 U. S., at 766–767; *Whitcomb* v. *Chavis*, 403 U. S., at 149–153.

[18] For instance, a city with a 20% Negro population and a five-member council elected in wards might be able to justify the placement of only 20% minority population in each district, despite a history of denial of access to the political process, by showing that the minority population was perfectly distributed throughout the municipality so that the creation of a Negro-majority ward was an impossibility. On the other hand, again assuming a history of denial of access to the political process, such a plan could not survive attack if the 20% Negro population of each ward were achieved by dividing five ways a concentrated bloc of Negro voters located in the center of the city.

bers. The Court's approach of focusing only on the five districts would allow covered municipalities to conceal discriminatory changes by making them a step at a time, and sending one two- or three-district alteration after another to the Attorney General for approval. If nothing beyond the districts actually before him could be considered, discriminatory effects could be camouflaged and the prophylactic purposes of the Act readily evaded.[19]

Thus the District Court correctly began by considering the seven-member council and a districting plan that, given New Orleans' long history of racial bloc voting,[20] allows Negroes the expectation of no more than one seat (14% of the council), if that, in a city with a 34.5% Negro voting population. Manifestly, the plan serves to underrepresent the Negro voting population. The District Court then, properly, turned to consider whether Negroes are excluded from full participation in the political processes in New Orleans. The court found con-

---

[19] This effect is clear in this case, where Negroes constitute 34.5% of the New Orleans electorate. Out of seven seats, Negroes should reasonably expect to control at least two. In considering only five seats, the Court suggests—properly, given its self-imposed limitation—that Negroes should have an expectancy of only one seat. *Ante,* at 137 n. 8. If only two of the five districts were before us, and assuming a 34.5% minority share of the voting population in those districts, the Court could properly conclude that Negroes could lay claim to neither of the two seats. Thus, under the Court's approach, the smaller the number of seats that the city may present for consideration, the grosser the discrimination that may be numerically tolerated.

[20] The tendency to racial bloc voting in New Orleans is a finding of fact by the District Court that is not challenged here. Such voting was encouraged until 1964 by a Louisiana statute, declared unconstitutional in *Anderson* v. *Martin,* 375 U. S. 399 (1964), that required the race of each candidate to be printed on the ballots used in all elections within the State.

siderable evidence of both past and present exclusion, none of which is seriously contested here.[21]

The court found that Louisiana's majority-vote requirement and "anti-single-shot" requirement operate as a practical matter to defeat Negroes in any district in which they do not constitute a majority,[22] that residual effects of Louisiana's long history of racial discrimination not only in voting, but also in public schools, public assemblies, public recreational facilities, public transportation, housing, and employment, remain; and that city officeholders have generally been unresponsive to the needs of the Negro community. The court looked to the many tactics that, until recently, had been employed with remarkable success to keep Negroes from voting in the State. See *Louisiana* v. *United States,* 380 U. S. 145, 147–150 (1965). And the court found that Negro access to the political process is even further narrowed by the fact that candidates in the all-important Democratic primary run on tickets. For a city council candidate to win nomination, which is tantamount to victory in the general election, it is critical to be placed on the ticket of the winning, always white, mayoral candidate. Negro candidates for city council, however, have never been placed on such a ticket. Indeed, no Negro has ever

---

[21] Appellants challenge the propriety of looking at this evidence in assessing the effect of Plan II, not its accuracy.

[22] The majority-vote requirement is a rule that the winner of an election must have a majority of the vote. Thus, in a race involving three or more candidates, a plurality of voters cannot elect their candidate. If no candidate wins a majority, there is a run-off election.

The "anti-single-shot" rule is a requirement that in a multi-member district the voter must vote for as many candidates as there are seats to be filled. Thus, although the voter may be interested in only one of the candidates, he must vote for others as well.

been elected to the city council, and the court found that on the rare occasions when a Negro has been elected to any office in the city, it has been because of the support of white candidates or of the white political organization, not because of the power of the Negro electorate. These findings plainly support the District Court's conclusion that the political processes of New Orleans are not open to Negroes on an equal basis with whites.

Since Negroes are underrepresented by Plan II and have been denied equal access to the political processes in New Orleans, Plan II infringes upon constitutionally protected rights, and only a compelling justification can save the plan. The very nature of the Negro community in New Orleans and the manner of its distortion by Plan II immediately place the city's explanations in a suspect light. The Negro community is not dispersed, but rather is collected in a concentrated curving band that runs roughly east-west. The districts in Plan II run north-south and divide the Negro community into five parts. Counsel for intervenor Jackson vividly described the effect of this division at oral argument:

> "You can walk from Jefferson Parish throughout the city for eight or ten miles through the St. Bernard Parish line and not see a white face along that band, that black belt, that parallels the river in a curve fashion throughout the city. White people live in the very wealthy sections of town out by the lake and along St. Charles Avenue to the river. The rest is left over for blacks, and these are heavy concentrations, and that plan devised by the City Council slices up that population like so many pieces of bologna . . . ." Tr. of Oral Arg. 30.

As Jonathan A. Eckert, the council staff member pri-

marily responsible for drafting Plan II, conceded in the District Court, the "inevitable result" of Plan II's north-south orientation is "to have districts in which blacks are generally in the minority, or at the most in a bare majority." 2 App. 346.

New Orleans relies on seven goals that it claims mandate a north-south scheme such as Plan II. The city's own belief in this conclusion is questionable in light of Mr. Eckert's testimony in the District Court that he and his staff had drafted at least two east-west plans that satisfied them. 1 App. 336–337. In any case, however, the asserted goals, whether taken alone or in combination, do not establish a compelling justification for the plan. One claimed purpose is to prevent dilution of the vote of minority groups. Plan II plainly does not achieve this goal. Two other asserted aims are to achieve substantial numerical equality among the five districts and to keep the resultant districts compact and contiguous. Both aims can be accomplished by any number of east-west plans as well. Three more proffered justifications are to preserve ward and precinct lines, natural boundaries, and manmade boundaries. But there are findings that ward lines cannot be observed in any case because of one-person, one-vote restrictions, and that precincts are sufficiently small that their integrity can be honored in east-west districts. This latter fact minimizes any adverse effects of violating natural and manmade boundaries, except to the extent that they divide communities of different social or economic interests. And Plan II only erratically keeps such communities intact.

It is only the seventh of the proffered goals that, if compelling, mandates a north-south scheme: keeping incumbents apart in the new districts so that they will

not have to run against one another for re-election.[23] Four of the five district councilmen live in an east-west line along the lake in the northern part of the city. East-west districts would place all four in the same one or two districts, 1 App. 125, 232, 235, and north-south lines are therefore necessary if these councilmen are to remain apart. 2 App. 344. While the desire to keep incumbents in separate districts may have merit in some contexts, it surely cannot stand alone to justify the substantial dilution of minority voting rights found here.

Thus, the city has failed to show an acceptable justification for the racially dilutive effect of Plan II. Accordingly, the District Court correctly concluded that appellants failed to demonstrate that Plan II would not have the effect of abridging the right to vote on account of race, and correctly denied the requested declaratory judgment.[24]

---

[23] The city asserts that its seventh goal is to retain "historic and traditional councilmanic district boundaries" so as to "preserve continuity within the electorate." Brief for Appellants 28–29. In fact, the record is conclusive that the goal was purely to keep incumbents apart. 1 App. 206–207; 2 App. 344, 557.

[24] While the Court today finds that the District Court erred in finding a discriminatory effect, it does not address the issue not reached by the District Court: whether Plan II was drafted with a discriminatory purpose. Of course, this question remains on remand. See *City of Richmond* v. *United States*, 422 U. S., at 378–379.