**CITY OF LOCKHART, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Civ. A. No. 80–364.**

United States District Court, District of Columbia.

July 30, 1981.

John Lewis Smith, III, Douglas K. Spaulding, Baker & Hostetler, Washington, D.C., Walter H. Mizell, Brown, Maroney, Rose, Baker & Barber, Austin, Tex., for plaintiff.

Robert S. Berman, Civil Rights Div., Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT and JUNE L. GREEN, District Judges.

### I. *Introduction*

This matter came on for trial before the Court on September 10 and 11, 1980. Upon consideration of the trial and the entire record herein, plaintiff's request for declaratory judgment is denied.

The City of Lockhart initiated this action pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Plaintiff seeks a declaratory judgment that the adoption in 1973 of a Home Rule Charter does not have the purpose, and will not have the effect, of denying or abridging the right to vote on account of race, color or membership in a language minority group. On September 11, 1980, the Court bifurcated the trial. The proceedings were limited to evidence pertaining to the "effect" of the adoption of the Home Rule Charter. The Court reserved the inquiry on the "purpose" of the adoption for a later time, if necessary.

### II. *Findings of Fact*

The City of Lockhart is located in Caldwell County, approximately thirty miles south of Austin, Texas.

In 1970, the City of Lockhart had a population of 6,489 persons, of whom 45% were Anglo, 41% were Mexican American and 14% were black. As of 1977, there were 3,267 registered voters in Lockhart, of whom 974 were Mexican Americans.

Under Texas state municipal law, municipalities are categorized as either "general law" cities, "special charter" cities or "home rule" cities. As explained hereinafter, Lockhart is a "general law" city.

A "special charter" city is similar to a "home rule" city in that the powers that each type of city possesses are derived from the same source (charter) and both are subject to the same statutory limitation.

There are, however, significant differences between a "general law" city and a "home rule" city. A "general law" city has the authority to undertake only what is specifically authorized by Texas law, while a "home rule" city has authority to do whatever is not specifically prohibited by state law. Thus, the practical effect is that the authority of a "general law" city to govern its own affairs is limited, while a "home rule" city has broad authority to govern its own affairs.

A "general law" city which operates under a commission form of government has no control over the size or the method of electing its governing body. Texas law rigidly requires that the commission consist of three individuals, a mayor and two commissioners, and that all three members be elected on an at-large basis. There is no authorization for an election scheme which features single-member districts, numbered posts, residency districts or staggering the terms of the commissioners.

A "general law" city, if it satisfies requirements imposed by state law, may adopt a city charter and become a "home rule" city. In drafting its charter, a municipality is free to adopt any provision which is not inconsistent with state law. Texas state municipal law requires that the municipality in opting for home rule select the powers it desires to exercise and the procedures necessary to implement those powers. In so doing, the municipality is free to choose the form of government under which it will operate and the governing body can be elected at-large or by single-member districts. At its option, the municipality may require that candidates designate the position or post for which they seek election (numbered-post provision). It may also provide that the terms of the members of the governing body be staggered. A "general law" city does not enjoy this latitude of choice.

Prior to February 20, 1973, the City of Lockhart was a "general law" city which operated under a commission form of government. As authorized by state law, the city was governed by a mayor and two commissioners who were elected at the same time on an at-large basis to two-year terms. In addition, and contrary to Texas law, candidates for election to the city com-

mission were required to designate the places they sought; i.e., numbered posts.

The limitations imposed upon the actions of "general law" cities by state law led the City of Lockhart to study, during 1972, the feasibility of acquiring "home rule" status. In July 1972, the Lockhart City Commission appointed for this purpose, pursuant to state law, a fifteen-member charter study committee composed of nine (9) Anglos, four (4) Mexican Americans and two (2) blacks. The charter study committee recommended that a charter commission be formed to draft a "home rule" charter for the City of Lockhart. The study committee was itself later elected as the Charter Commission. The Charter Commission used as a model the charter of the City of Gonzales, Texas, a town similar in size to Lockhart and located approximately thirty miles south of Lockhart. The plan adopted followed the Gonzales model with the principal difference being that the Lockhart plan provided for numbered-post positions.

The Home Rule Charter, as drafted by the Lockhart Charter Commission, was adopted by the citizens of Lockhart on February 20, 1973. Under the charter the new plan of government for the City of Lockhart was a council-manager form, consisting of a mayor and four councilmembers elected to numbered posts on an at-large basis. The charter also provided that the mayor and two councilmembers would be elected one year and the remaining two councilmembers would be elected the following year (staggered terms). Elections pursuant to the plan were held from the time of its adoption in 1973 until 1978. This governance and election plan is before the Court for Section 5 review.

In 1977, a lawsuit challenging, on constitutional grounds, the system of electing members to the city council was filed against the City of Lockhart by four Mexican-American citizens. The record in that action revealed that the governance and election plan adopted by the City of Lockhart's Home Rule Charter had not received the requisite preclearance, pursuant to Section 5 of the Voting Rights Act. *Cano v. Kirksey,* No. 77–CA–133 (W.D.Tex.1977).

Another action was thereafter filed against the City of Lockhart, seeking to enjoin the city from utilizing this or any unprecleared change affecting voting, unless and until such change received the necessary Section 5 preclearance. The Court, in granting injunctive relief, found that the "home rule" governance and election plan had not received the necessary Section 5 review. The Court found that "among the major changes required by the adoption of the Home Rule Charter was to enlarge the city council to four members, plus the mayor, and to adopt a numbered place system for the election of councilmembers." *Cano v. Chessar,* A–79–CA–032, (W.D.Tex. March 2, 1979).

Following the order of the Court in *Cano v. Chessar,* A–79–CA–032, the City of Lockhart submitted the "home rule" governance and election plan to the Attorney General for Section 5 review. The City of Lockhart's Section 5 submission was received by the Attorney General on May 7, 1979. On June 27, 1979, the Attorney General requested that the city provide additional information. The city's response was received on July 17, 1979, and a Section 5 objection to the home rule governance and election plan was interposed, by the Assistant Attorney General acting on behalf of the Attorney General, on September 14, 1979. The present action by the City of Lockhart followed.

There exists a pattern of racial bloc voting in the City of Lockhart. Election returns from municipal elections held since 1973 show a high correspondence between Spanish-surnamed voters who voted in the particular election and the number of votes received by the Spanish-surnamed candidate.

Although Mexican Americans constitute over 40% of the population of the City of Lockhart, only one Mexican American has ever served on the Lockhart governing body. The one Mexican American to win a municipal election contest, Mr. Rangel, won a position on the council in 1978, when five persons, including four Anglos, sought elec-

tion to Place 1. In that election 660 of the total of 1,993 voters were Mexican Americans and Mr. Rangel received 655 votes (the close similarity of those figures is clearly indicative of racial bloc voting). Since the Anglo vote was split among four Anglo candidates, Mr. Rangel prevailed with the highest number of votes.

Mr. Rangel's victory demonstrates that the larger number of candidates for a given position, the better is the chance of Mexican Americans to elect candidates of their choice. The voting results before the Court bear this out. For example, in the same year that Mr. Rangel was elected to Place 1, a Mexican American sought the position of mayor and another sought the position as councilmember for Place 2. In each instance, the number of votes received by the Mexican American candidate was approximately the same as the number of Mexican American voters. However, in each instance, the remaining votes were split among only three Anglo persons who were serious candidates, and in each instance the Mexican American candidate was defeated.

Under an at-large electoral system without numbered posts, a cognizable voting minority can leverage their voting strength by single-shot or bullet voting.

The imposition of numbered posts diminishes this leverage. It does so in two ways. Expert witnesses for all parties agreed that the imposition of a numbered-post provision reduces the field of candidates for election, and at the same time, highlights the individual candidates for each position. This double result nullifies the effects of single-shot voting by forcing minority voters to cast a vote for each numbered position. This reduction in the size of the candidate field and consequent highlighting of candidates is detrimental to minority or minority-supported candidates.

The employment of staggered terms further diminishes this leverage. Staggered terms in an electoral system highlight individual contests and emphasize individual confrontations between candidates. This is usually to the detriment of the minority or minority-supported candidate, because "single shot" voting is less effective.

The enlargement of Lockhart's governing body from three to five does not offset the disadvantage to minorities of numbered posts and staggered terms. Although the study relied upon by Dr. Taebel indicates, as a general theory, that enlargement of a city's governing body may enhance the effect of the minority's franchise, the enlargement at issue here (i.e., from three to five members) is not significant enough to provide any clear benefit to Mexican American voters since both the three-member general law commission and the five-member home rule council would be classified as "small."

III. *Conclusions of Law*

1. This Court has jurisdiction to hear and determine the plaintiff's request for Section 5 preclearance of the voting changes involved in this litigation. 42 U.S.C. 1973c; 28 U.S.C. 1346(a)(2).

2. The Court is properly convened as a court of three judges. 42 U.S.C. 1973c; 28 U.S.C. 2284.

3. The Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.* was enacted to insure the protection of rights guaranteed by the Fifteenth Amendment and "to rid the country of racial discrimination in voting." *South Carolina v. Katzenbach,* 383 U.S. 301, 315, 86 S.Ct. 803, 811, 15 L.Ed.2d 769 (1966).

4. The State of Texas is subject to the preclearance requirements of Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c, 40 Fed.Reg. 43746 (1975).

5. Voting changes enacted or administered by the State of Texas and the City of Lockhart after November 1, 1972, are subject to the preclearance requirements of Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c.

6. Under Section 5, the City of Lockhart may not enforce or implement any change in "any voting qualification or prerequisite to voting, or standard practice or procedure with respect to voting," unless such change has either been precleared by the Attorney General, or unless the City of Lockhart

obtains a declaratory judgment in the United States District Court for the District of Columbia that such change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color [or membership in a language minority group]." 42 U.S.C. 1973c.

■ 7. The "home rule" governance and election plan adopted by the City of Lockhart on February 20, 1973 is subject to the preclearance requirements of Section 5. *Cano v. Chessar,* A–79–CA–0032 (W.D.Tex., March 2, 1979).

■ 8. The Court concludes that the numbered-post provision of the election plan set forth in the Lockhart City Charter is subject to Section 5 review. In reaching this conclusion, the Court is mindful of the U.S. Supreme Court's decision in *Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1975), but concludes that *Beer* is clearly distinguishable from the instant case. In *Beer,* the City of New Orleans sought a judgment declaring that a reapportionment of its five councilmanic districts did not violate Section 5. The 1954 New Orleans city charter provided for a seven-member city council, with one member being elected from each of five councilmanic districts, and two being elected at large. The reapportionment was required after each decennial census by the same city charter.

The U.S. District Court for the District of Columbia held that the entire reapportionment plan for five councilmanic districts was invalid because it would have the effect of abridging the right to vote on account of race or color. The District Court also held, more pertinently, that as a separate and independent ground, the reapportionment plan could not withstand Section 5 scrutiny solely because it did not enhance the minority vote by eliminating the two discriminatory at-large seats which had existed without change since 1954. On this aspect of the case, the U.S. Supreme Court held that the two at-large councilmanic seats were not subject to Section 5, stating:

"Discriminatory practices ... instituted prior to Nov. 1964 ... are not subject to the requirement of preclearance under Section 5. (Citations omitted). The ordinance that adopted [the Reapportionment Plan] made no reference to the at-large councilmanic seats. Indeed, since those seats had been established in 1954 by the city charter, an ordinance could not have altered them; any change in the charter would have required approval by the city's voters. 425 U.S. 138–9, 96 S.Ct. at 1362.

The Court also held that the reapportionment plan enhanced the position of racial minorities and that such an ameliorative plan could not have the effect of denying or abridging the right to vote on account of race or color in violation of the statute.

The circumstances presented herein are different. Here, the previously illegal numbered posts were included specifically in the Home Rule Charter presently at issue, and the charter was approved specifically by the voters in Lockhart. This approval abolished completely the commission form of government and substituted in its stead an entirely new form of city government with an entirely new election scheme. In *Beer,* the legitimate albeit discriminatory at-large seats established in 1954 were not mentioned in the implementing ordinance, and the voters were not called upon to consider them. As the language from *Beer,* cited *supra,* indicates, these were facts that the U.S. Supreme Court expressly relied on.

Moreover, when Lockhart originally adopted the numbered-post provisions of its election plan in 1917, it did so without authority and in violation of state law. As a "general law" city, the power of Lockhart's city government was limited to those prescribed under state law. Tex. Civil Statutes §§ 961 *et seq.* The state legislature had determined the methods of election of general law cities. Tex. Civil Statute § 1158. There is no provision under Texas law authorizing "general law" cities to use numbered posts.

■ Under Texas law, a city can exercise only those powers conferred by law.

*City of West Lake Hills v. Westwood Legal Defense Fund,* 598 S.W.2d 681 (Tex.Civ. App.1980). All acts done beyond those powers conferred are void. *City of Fort Worth v. Lillard,* 272 S.W. 577 (Tex.Civ. App.1925).[1] Moreover, the mere assumption and assertion by a city of a power not granted to it gains nothing by lapse of time. *Conklin v. City of El Paso,* 44 S.W. 879, 882 (Tex.Civ.App.1897) cf. *City of Beaumont v. Moore,* 202 S.W.2d 448 (Supreme Court of Texas 1947) (where a contract of a municipal corporation is ultra vires and void, there is no contract to rescind); *Pasadena Police Officers Association v. Pasadena,* 497 S.W.2d 388 (Tex.Civ.App.1973) (A municipality's void act, one that is beyond its powers may not be validated upon principles of estoppel); *Young v. City of Seagoville,* 421 S.W.2d 485 (Tex.Civ.App.1967) (ordinance void at time of adoption for conflict with statute statute did not become valid upon repeal of statute). As this Court interprets the foregoing authorities, the numbered-post provision, illegitimate at inception, must be treated for Section 5 purposes as if it had never existed until it appeared legitimately pursuant to Texas law in the 1975 Lockhart City Charter. In summary, the validation of the previously illegal numbered posts represents a change in voting procedures which is completely dissimilar to the continuation of the two at-large councilmanic seats in *Beer* which were unchanged.

The Court does not consider *Perkins v. Matthews,* 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971) to undercut this conclusion. In *Perkins,* plaintiffs sought to enjoin the 1969 election for city offices in Canton, Mississippi. Plaintiffs alleged that the newly utilized at-large election of aldermen differed from the ward election feature utilized prior to November 1, 1964. The at-large feature had been required by a Mississippi state statute since 1962 that had heretofore been overlooked. The city argued that, having learned of the 1962 statute, it had no choice but to comply with it in the 1969 elections and that there was no change subject to § 5 preclearance. The United States Supreme Court noted first that a change from ward to at-large alderman elections had been found previously to be a change within the coverage of § 5. *Id.* at 394, 91 S.Ct. at 439. In the context of the suspicious facts before it, the Court extended the coverage of § 5 to include Canton's belated 1979 change from ward to at-large even though it had been required since 1962, before the operative date of § 5. In so doing, the court extended § 5 protection to the fullest extent, in accordance with the policy underlying the Voting Rights Act as set forth in prior case law and the legislative history. This Court, in reaching its conclusion that Lockhart's numbered-post provision utilized illegally for over 50 years and legitimatized in 1973 is within § 5 seeks to do the same. To hold otherwise, to permit plaintiff's discriminatory numbered-post provision to escape § 5 preclearance, would reward plaintiff for its illegal activities in the past.

■ There is an additional reason why the numbered-post provision is a Section 5 change and must be reviewed. Prior to February 20, 1973, the city was governed by a mayor and *two* commissioners who were elected on an at-large basis to two-year terms at the same time. The new city charter provided that Lockhart would be governed by a mayor and *four* commissioners elected on an at-large basis to two-year terms, and the terms were to be *staggered.* The mayor and two council members would be elected in one year and the remaining two council members the next. The new plan requires elections every year as opposed to every other year under the old plan, and the discriminatory impact of the numbered posts under the new plan affects twice as many elections for a larger number of positions. Section 5 is concerned with the reality of changed practices as they affect minority voters, *Georgia v. United Washington,* 442 F.2d 123 (D.C.Cir.1971). 56 Am.Jur.2d 406, Municipal Corporations, Counties and other Political Subdivisions § 374 and cases cited in n. 16 therein.

---

1. This is the universal rule of application; *e.g., Marengo v. Rowland,* 263 Ill. 531, 105 N.E. 285, (Ill.1914) (ultra vires actions held of no effect); *Maryland & D.C. Rifle & Pistol Association v.*

*States,* 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973), and is intended to reach any enactment which alters the election law in even a minor way. *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). Even assuming the validity of the original two numbered-post provisions, the provision for an additional two numbered-posts in conjunction with the provision for staggered terms has a synergistic discriminatory effect. This is again completely different from the continuation of the provision for two at-large councilmanic seats in *Beers.*

■ 9. In this declaratory judgment action under Section 5, the plaintiff has the burden of proving that the governance and election plan at issue does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. The absence of both discriminatory purpose and discriminatory effect must be established by plaintiff. The inability of the plaintiff to establish the absence of the prohibited effect precludes the plaintiff from obtaining the requested relief. 42 U.S.C. 1973c; *City of Rome v. United States,* 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980); *South Carolina v. Katzenbach, supra,* 383 U.S. at 335, 86 S.Ct. at 822; *Georgia v. United States,* 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1975); *City of Richmond v. United States,* 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975); *City of Petersburg v. United States,* 354 F.Supp. 1021 (D.D.C.1972), *aff'd.,* 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973); *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969); *Beer v. United States,* 425 U.S. 130, 140–41, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976).

10. Both the Congress and the Supreme Court have established that the imposition of numbered posts and staggered terms can have a discriminatory impact on minority voting rights. The Supreme Court has recognized that an election plan which contains features such as numbered posts and staggered terms, when combined with the presence of racial bloc voting, has a discrimina-

tory impact on the group of persons whom the Voting Rights Act was designed to protect. In extending the Voting Rights Act of 1975, the Congress found numbered posts to be a potentially discriminatory device. *City of Rome v. United States,* 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980); S.Rep. No. 94–295, 94th Cong. 1st Sess. 27–28 (1975); H.R.Rep. No. 94–196, 94th Cong. 1st Sess. 19–20 (1975), U.S.Code Cong. & Admin.News 1975, 774.

■ 11. The Court recognizes that the City of Lockhart is not required to search for ways to maximize the political strength or representation of Mexican-American citizens. *City of Richmond v. United States, supra,* 422 U.S. at 370–72, 95 S.Ct. at 2303; *Gilbert v. Sterrett,* 509 F.2d 1389, 1394 (5th Cir.1975); *Cousins v. City Council of the City of Chicago,* 503 F.2d 912, 920 (7th Cir.1974); *Turner v. McKeithen,* 490 F.2d 191, 197 (5th Cir.1973); *Howard v. Adams County Board of Supervisors,* 453 F.2d 455, 458 (5th Cir.1972).

■ 12. The plaintiff has failed to demonstrate, however, that the "home rule" governance and election plan will not have a discriminatory effect on Mexican-American voters' ability to elect candidates of their choice. Although the at-large system, by itself, does not deny Mexican-American voters the opportunity to elect candidates of their choice, the imposition of the numbered-post and staggered-term provisions has clearly had and will continue to have such an effect on Mexican-American voters.

13. Unlike *Beer,* the apportionment plan before us is not ameliorative but is retrogressive because the ability of Mexican Americans to participate in the political process and to elect their choices to office is diminished by the numbered-post and staggered-term provisions.

14. The failure of the city to sustain its burden of showing that the adoption of the home rule governance and election plan has not had, and will not in the future have, the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group requires

that the request for declaratory judgment be denied. 42 U.S.C. 1973c; *Hale County v. United States,* C.A. 77–0286 (D.D.C. Sept. 4, 1980); *City of Rome v. United States, supra; Donnell v. United States,* C.A. 78–0392 (D.D.C. July 31, 1979) *aff'd.* 444 U.S. 1061, 100 S.Ct. 1000, 62 L.Ed.2d 743 (1980).

In light of the foregoing, this action is dismissed.

For the Court.

SPOTTSWOOD ROBINSON, III, Chief Judge, dissenting:

With all due respect for my colleagues' views, I am unable to join in their refusal to preclear the contested provisions of the City of Lockhart's home-rule charter. My reading of the Supreme Court's decision in *Beer v. United States*[1] leads me to conclude, on the facts here, that the numbered seats and staggered terms incorporated into the charter's scheme of councilmanic elections will not have the effect of denying or abridging the right to vote on account of race, color or language-minority membership within the meaning of Section 5 of the Voting Rights Act of 1965.[2] Accordingly, I must dissent.

## I. BACKGROUND

### A. *The Beer Decision*

My starting point is *Beer.* There the City of New Orleans sought a judgment declaring that a proposed reapportionment of councilmanic districts did not succumb to Section 5. Notwithstanding the reapportionment plan's capability of increasing the power of the city's black vote somewhat,[3] this court withheld the requested relief on the ground that the plan left black citizens unable to elect councilmembers in the proportion they bore to the city's population or the total of its registered voters.[4] As an independent reason for denying preclearance, this court further held that the city's failure to eliminate a 1954 charter provision establishing two at-large council seats itself had the effect of abridging the right to vote on the basis of race.[5]

On appeal, the Supreme Court first addressed the ruling in regard to the at-large seats. Noting the Government's concession of error thereon, the Court explained that

[t]he language of § 5 clearly provides that it applies only to proposed changes in voting procedures. "[D]iscriminatory practices ... instituted prior to November 1964[6] ... are not subject to the requirement of preclearance [under § 5]."[7]

Because the charter provision creating the at-large seats had been adopted in 1954,[8] the Court held that the seats "were not subject to review in this proceeding under § 5."[9]

The Court then turned to a claim of further error in the ruling that the reappor-

1. 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976).

2. Pub.L. No. 89–110, § 5, 79 Stat. 439 (1965), as amended, 42 U.S.C. § 1973c (1976). The Act is hereinafter cited as codified. I do not address the question whether the charter provisions in suit were conceived with any such purpose in mind. See note 37 *infra.*

3. The New Orleans reapportionment plan envisioned production of black population majorities in two councilmanic districts and a black voter majority in one. Under the pre-existing plan, black citizens were a majority of the population in only one district and a minority of registered voters in all. See *Beer v. United States, supra* note 1, 425 U.S. at 136, 96 S.Ct. at 1361, 47 L.Ed.2d at 636.

4. *Beer v. United States,* 374 F.Supp. 363, 389–390 (1974) (three-judge court).

5. *Id.* at 402.

6. Voting-procedure changes occurring in New Orleans after November 1, 1964, statutorily became subject to § 5 scrutiny. The relevant date for Lockhart is November 1, 1972. See 42 U.S.C. § 1973c (1976).

7. *Beer v. United States, supra* note 1, 425 U.S. at 138, 96 S.Ct. at 1362, 47 L.Ed.2d at 638 (bracketed material in original), quoting United States Commission on Civil Rights, The Voting Rights Act: Ten Years After 347 (1975) [hereinafter cited as *Ten Years After*].

8. See *Beer v. United States, supra* note 1, 425 U.S. at 138, 96 S.Ct. at 1263, 47 L.Ed.2d at 638.

9. *Id.* at 139, 96 S.Ct. at 1362, 47 L.Ed.2d at 638.

tionment plan was unacceptable for the additional reason that it would dilute the black vote in New Orleans' councilmanic elections. Adverting to the legislative history of the Act, the Court quoted at length from the House Report:

"Section 5 was a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down. That practice had been possible because each new law remained in effect until the Justice Department or private plaintiffs were able to sustain the burden of proving that the new law, too, was discriminatory.... Congress therefore decided, as the Supreme Court held it could, 'to shift the advantage of time and inertia from the perpetrators of the evil to its victim,' by 'freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory.' " [10]

"Section 5 was intended," the Court said, " 'to insure that [the gains thus far achieved in minority political participation] shall not be destroyed through new [discriminatory] procedures and techniques.' " [11]

The *Beer* Court also looked to a legislative event transpiring after adoption of the Act:

When it adopted a 7-year extension of the Voting Rights Act in 1975, Congress explicitly stated that "the standard [under § 5] can only be fully satisfied by determining ... whether the ability of minority groups to participate in the political process and to elect their choices to office is *augmented, diminished, or not affected* by the change affecting voting...." [12]

"In other words," the Court admonished, "the purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a *retrogression* in the position of racial minorities with respect to their effective exercise of the electoral franchise." [13]

Employing this analysis, the Court held that whatever deficiencies from another viewpoint the New Orleans plan might have, an electoral scheme that enhanced the voting power of racial minorities could "hardly have the 'effect' of diluting or abridging the right to vote on account of race within the meaning of § 5." [14] Accordingly, the Court set this court's judgment aside and remanded for further proceedings.[15]

## B. *The Home-Rule Charter*

A brief description of the case at bar will highlight the issues. Prior to adoption of its home-rule charter in 1973, the City of Lockhart was governed by a commission composed of a mayor and two commissioners.[16] All three were elected at large for two-year terms by pluralities at elections

---

**10.** *Id.* at 140, 96 S.Ct. at 1363, 47 L.Ed.2d at 639, quoting H.R.Rep. No. 94–196, 94th Cong., 1st Sess. 57–58 (1975) (additional citations omitted). "By prohibiting the enforcement of a voting-procedure change until it has been demonstrated to the United States Department of Justice or to a three-judge federal court that the change does not have a discriminatory effect, Congress desired to prevent States from 'undo[ing] or defeat[ing] the rights recently won' by Negroes." *Beer v. United States, supra* note 1, 425 U.S. at 140, 96 S.Ct. at 1363, 47 L.Ed.2d at 639, quoting H.R.Rep. No. 91–397, 91st Cong., 1st Sess. 8 (1969), U.S.Code Cong. & Admin.News 1970, 3277. See also *South Carolina v. Katzenbach,* 383 U.S. 301, 355, 86 S.Ct. 803, 832, 15 L.Ed. 769, 802 (1966).

**11.** *Beer v. United States, supra* note 1, 425 U.S. at 140–141, 96 S.Ct. at 1363, 47 L.Ed.2d at 639, (bracketed material in original), quoting S.Rep.

No. 94–295, 94th Cong., 1st Sess. 19 (1975), U.S.Code Cong. & Admin.News 1975, 774 (emphasis supplied).

**12.** *Beer v. United States, supra* note 1, 425 U.S. at 141, 96 S.Ct. at 1363, 47 L.Ed.2d at 639, quoting H.R.Rep. No. 196, 94th Cong., 1st Sess. 60 (1975) (emphasis in original).

**13.** *Beer v. United States, supra* note 1, 425 U.S. at 141, 96 S.Ct. at 1364, 47 L.Ed.2d at 639 (emphasis supplied).

**14.** *Id.*

**15.** *Id.* at 143, 96 S.Ct. at 1364, 47 L.Ed.2d at 640.

**16.** See Majority Opinion (Maj. Op.) at 583.

held in even-numbered years.[17] Consistently since 1917, the two commissioner posts were numbered; that is, candidates were required to designate which of the two seats they sought.[18]

The home-rule charter provides, however, for a council-manager form of government, consisting of a mayor and four councilmembers.[19] The mayor and two councilmembers are to be elected at-large by pluralities in even-numbered years for two-year terms,[20] and the two council seats are to be numbered.[21] The two additional councilmembers are to be elected in similar fashion—at-large on a numbered-post basis by pluralities for two-year terms—except that elections for these two are to be held in odd-numbered years.[22] Thus, the three changes that would be made in the city's electoral scheme by the movement from commission to council-manager government are: the increase from two commissioner to four council seats, the numbering of the two new seats, and the staggering of councilmembers' terms.

The city submitted the charter to the Attorney General for Section 5 preclearance and, failing that, followed with this action for a preclearing declaratory judgment. The new plan is attacked[23] on the ground that the city has not shown that the num-

bered seats on the council and the staggered terms of councilmembers pass muster under Section 5, and my colleagues hold that they do not.[24] Now considering these facets of the controversy in turn, I elucidate my disagreement.

## II. ANALYSIS

### A. *Basic Considerations:*

Racial bloc-voting is a reality in the City of Lockhart,[25] and indubitably numbered posts and staggered terms tend to curb the ability of minorities to elect minority candidates.[26] Minority voting power may be strongly felt when a large number of candidates for several offices are pitted against each other in a single plurality-win contest, from which the top vote-getters will emerge victorious.[27] If, for example, there are four unnumbered offices and twelve candidates are vying for them in such a contest, the four receiving the highest number of votes will prevail.[28] By concentrating its votes on one candidate—so-called "single-shot" voting[29]—and when aided by a splitting of the majority vote among more than one candidate, a minority group succeeds or assists in electing its own candidate if he or she comes in no lower than fourth.[30]

---

**17.** *Id.*

**18.** *Id.* at 583, 588. For reasons hereinafter explained, see text *infra* at note 51, I do not join my colleagues in inquiring whether the city's pre-charter use of these numbered posts was authorized by state law. See *id.* at 588, 589. It bears mention, however, that the practice was never challenged, and that it remained in vogue until Lockhart's home-rule charter emerged in 1973.

**19.** *Id.* at 584.

**20.** *Id.*

**21.** *Id.*

**22.** *Id.*

**23.** By the United States and by the intervenor.

**24.** Maj. Op. at 586–589. My colleagues seemingly concede, and I agree, that the increase in the size of Lockhart's governing body, standing alone, will not dilute the voting power of its minorities. See *id.* at 589.

**25.** See *id.* at 585–586.

**26.** See generally *Ten Years After, supra* note 7, at 206–208; *City of Rome v. United States,* 446 U.S. 156, 184 n. 19, 185 n. 21, 100 S.Ct. 1548, 1565 n. 19, 1566 n. 21, 64 L.Ed.2d 119, 144 n. 19, 145 n. 21 (1980).

**27.** See *Ten Years After, supra* note 7, at 206–208.

**28.** See note 30 *infra.*

**29.** "Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." *Ten Years After, supra* note 7, at 207.

**30.** *Id.* at 206–207. The example assumes not only that there is no majority-vote requirement but also that there is no impediment to single-shot voting.

Numbered posts and staggered terms—singly or in combination—render single-shot voting less potent, if not wholly ineffective, by inducing head-to-head contests in which only one candidate can win. By requiring candidates to specify the posts to which they seek election, numbering individualizes the contests and insures that only the candidate garnering the highest number of votes for a particular post will secure it.[31] Similarly, by staggering the terms of offices, fewer posts are at stake in any given election, and the number of top vote-getters who can win is correspondingly reduced.[32] If the terms are completely staggered—that is, only one post becomes vacant in each election year—any potential that single-shot voting might otherwise have is entirely eliminated, just as it is by post numbering.[33] Both procedures also tend to highlight racial identities of candidates in multiracial campaigns, increasing the likelihood that majority voters will vote against minority candidates simply because they are minority members, rather than for candidates on the basis of perceived merit.[34] When numbered posts and staggered terms exist in tandem, the racial factor becomes heightened even further.[35]

That numbered posts and staggered terms can, and frequently do, impact minority voting adversely, however, is not the end of the analysis demanded by Section 5. As *Beer* instructs, Section 5 bars voting procedures only when they are "changes" within its meaning and as such they "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."[36] I thus proceed to consider the procedures here under assault in light of these statutory limitations.[37]

### B. The Numbered Posts

Save for the office of mayor, numbered seats have been standard in Lockhart's elections since 1917—almost 50 years before passage of the Voting Rights Act. Nonetheless, my colleagues deem the charter provision perpetuating numbering of the two original seats on the city's governing body a "change" in voting procedure subject to Section 5 review.[38] They would sidestep the Supreme Court's teaching on that score by distinguishing *Beer* on two grounds. First, they point out that while the two New Orleans at-large seats established in 1954 were not mentioned in that city's 1971 redistricting plan, Lockhart's new charter ushers in a new form of municipal government.[39] That is so, but the methodology of electing two members of the governing body—the new council—in even-numbered years remains exactly as it was for the old commission.[40] Nothing in the record suggests for the occupants of these two seats anything more than new titles.[41] I fail to see how mere renaming of

**31.** *Id.* at 207.

**32.** See *id.* at 208. Thus, if only two rather than four offices are open at election time, the minority candidate must place at least second.

**33.** *Id.* at 208.

**34.** See Maj.Op. at 585.

**35.** Racial identities obviously are most visible when an election is for only one office.

**36.** *Beer v. United States, supra* note 1, 425 U.S. at 141, 96 S.Ct. at 1364, 47 L.Ed.2d at 639.

**37.** Under § 5, the city bears the burden of proving both an absence of discriminatory purpose and a lack of discriminatory effect. See, *e.g., City of Rome v. United States, supra* note 26, 446 U.S. at 183 n. 18, 100 S.Ct. at 1565 n. 18, 64 L.Ed.2d at 144 n. 18; *Beer v. United States, supra* note 1, 425 U.S. at 140–141, 96 S.Ct. at 1363, 47 L.Ed.2d at 638–639; *Georgia v. United States,* 411 U.S. 526, 538, 93 S.Ct. 1702, 1709, 36 L.Ed.2d 472, 483 (1973). We bifurcated trial of the instant case for initial consideration only of the new charter's effect, leaving the purpose in adopting it for later inquiry should the occasion arise. Accordingly, I restrict myself at this stage of the litigation solely to the issue of effect. But see text *infra* at note 71.

**38.** Maj. Op. at 586–588.

**39.** *Id.* at 586.

**40.** See text *supra* at notes 16–22.

**41.** Delbert A. Taebel, an expert, testified that Lockhart's pre-charter characteristics were similar to those of a council-manager form of government. Trial Transcript (Tr.) 68; the

the two posts removes this case from the controlling authority of *Beer*.

My colleagues further say that while New Orleans had "legitimate[ly]" acquired the two at-large seats by its city charter in 1954, Lockhart originally had instituted and long had maintained numbered commissioner seats "without authority and in violation of state law."[42] The city hotly disputes this premise, but I need not enter the debate, for it is completely beside the point. Section 5 subjects voting procedures to need for preclearance only to the extent that they may be "different from [those] in force or effect on" the date statutorily made relevant.[43] Congress explicated no distinction between valid and invalid preexisting procedures, and the Supreme Court has stated unambiguously that " '[d]iscriminatory practices ... instituted prior to [the date statutorily pertinent] ... are not subject to the requirement of preclearance [under § 5].' "[44] More importantly, the Court has made plain enough that a voting procedure is "in force or effect" for purposes of Section 5 coverage notwithstanding even gross inconsistency with state law. In *Perkins v. Matthews*,[45] the City of Canton, Mississippi, switched in 1969 from ward to at-large elections of aldermen. That very change was commanded by a 1962 Mississippi statute, but Canton ignored the statute and in 1965 elected aldermen by wards, as previously it had done in 1961.[46] The question was the procedure "in force or effect" on November 1, 1964, when Canton became subject to the

Act.[47] In concluding that the change was covered by Section 5, the Court reasoned:

> In our view, § 5's reference to the procedure "in force or effect on November 1, 1964," must be taken to mean the procedure that would have been followed if the election had been held on that date. That judgment is necessarily a matter of inference in this case since Canton did not hold a municipal election on November 1, 1964. . . .

> With the benefit of hindsight, ... we know that Canton elected its aldermen by wards in its June 1965 municipal election. The record reflects no relevant change between November 1964 and June 1965 to suggest that a different procedure would have been in effect if the elections had been held seven months earlier. Consequently, we conclude that the procedure *in fact* "in force or effect" in Canton on November 1, 1964, was to elect aldermen by wards. That sufficed to bring the 1969 change within § 5.[48]

The significance of *Perkins* for the case at hand can hardly be mistaken. The Court held that the procedure "in force or effect" on November 1, 1964, was ward election of alderman, even though that procedure directly contravened a state statute enacted two years earlier. That an existing procedure violates state law, then, is not itself an escape route from Section 5 coverage. Moreover, the procedure "in force or effect" in Canton on the date relevant was "necessarily a matter of inference."[49] The case

---

commissioners, he said, did not perform administrative tasks. Tr. 75. "A commissioner in this sense," the witness explained, "was actually a council member. In Texas we use the word 'commission' and 'council members' interchangeably frequently," Tr. 75, and the change in name from commissioner to councilperson is without significance. Tr. 75.

**42.** Maj.Op. at 586.

**43.** 42 U.S.C. § 1973c (1976).

**44.** *Beer v. United States, supra* note 1, 425 U.S. at 138, 96 S.Ct. at 1362, 47 L.Ed.2d at 638, (bracketed material in original), quoting *Ten Years After, supra* note 7, at 347.

**45.** 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971).

**46.** *Id.* at 394, 91 S.Ct. at 439–440, 27 L.Ed.2d at 488.

**47.** *Id.*

**48.** *Id.* at 394, 395, 91 S.Ct. at 440, 27 L.Ed.2d at 488–48.

**49.** The inference was compelling enough to overcome the normal presumption that public officials act in accordance with law, and to set for naught Canton's argument that it did no more than obey the 1962 statute in its 1969 elections. *Id.* at 394–395, 91 S.Ct. at 440, 27 L.Ed.2d at 488–489.

now before us is much stronger, for we know that Lockhart actually had assigned post-numbers to the two original seats on its governing body, and had done so for more than a half-century before the home-rule charter came about.[50] No less in Lockhart than in Canton, it is "the procedure *in fact* in force or effect," whatever its legal status under state law, that measures the coverage of Section 5.

Bound by an interpretation so clear, I cannot agree that the Lockhart charter's adoption of an ongoing pre-1964 voting procedure—even one that until then may have been unlawful under state law—is a change in that procedure within the contemplation of Section 5. For that reason, I do not join my colleagues in their hazardous undertaking to determine whether Lockhart's utilization of numbered commission seats was ultra vires under state law, and thus was vulnerable to attack on that ground.[51] I simply cannot concur in their conclusion that, for purposes of Section 5 coverage, the numbered-post procedure applied to those two seats is to be treated as though it was not "in force or effect" during the pre-charter era.

My colleagues also say that "[e]ven assuming the validity of the original two numbered-post provisions, the provision for an additional two numbered-posts in conjunction with the provision for staggered terms have a synergistic discriminatory effect."[52] While I believe the numbered-post technique as applied to the two council seats that are originals is not subject to Section 5 preclearance, the expansion of Lockhart's governing body to four numbered council seats admittedly is a "change" intercepted by Section 5 for preclearance.[53] But the conclusion that this change will deny or abridge minority voting rights within the meaning of Section 5 runs afoul of another branch of the *Beer* ruling.[54]

After reviewing relevant aspects of the Act's legislative history, the *Beer* Court made known that the crucial inquiry under Section 5 is " 'whether the ability of minority groups to participate in the political process and to elect their choices to office is *augmented, diminished, or not affected* by the change affecting voting.' "[55] That is because "the purpose of § 5 has always been to insure that no voting-procedure change would be made that would lead to a *retrogression* in the position of racial minorities with respect to their effective exercise of the electoral franchise."[56] It is abundantly clear that the addition of the two numbered council seats to be filed in odd-numbered years in no way deteriorates the strength of the minority vote in Lockhart.[57] For many years before the city adopted its home-rule charter, candidates for commissioner posts were required to designate which of the two seats then available they would campaign for,[58] and consequently no opportunity for single-shot voting in those elections was ever presented.[59] Under the 1973 charter, councilmanic candidates must specify one of the seats now provided,[60] and single-shot balloting remains an impossibility, but the decisive question is whether

**50.** See text *supra* at note 18.

**51.** See Maj.Op. at 586–587.

**52.** *Id.* at 588.

**53.** See, *e.g., United States v. Board of Comm'rs,* 435 U.S. 110, 122–123, 98 S.Ct. 965, 974–975, 55 L.Ed.2d 148, 160–161 (1978), and cases there cited.

**54.** I later consider my colleagues' argument on synergism. See Part II(C) *infra.*

**55.** *Beer v. United States, supra* note 1, 425 U.S. at 141, 96 S.Ct. at 1363, 47 L.Ed.2d at 639, quoting H.R.Rep. No. 196, 94th Cong., 1st Sess. 60 (1975) (emphasis in original).

**56.** *Beer v. United States, supra* note 1, 425 U.S. at 141, 96 S.Ct. at 1364, 47 L.Ed.2d at 639 (emphasis supplied).

**57.** Mexican Americans are by far the largest minority in Lockhart, see Maj.Op. at 583, and the minority upon which this litigation directs its principal focus.

**58.** See text *supra* at note 18.

**59.** See text *supra* at notes 25–33.

**60.** See text *supra* at notes 21–22.

Lockhart's minorities are worse off than they were before. My colleagues point out that since the two new council seats, like the two old commissioner seats, are numbered posts, "the discriminatory impact of the numbered posts ... affects twice as many elections for a larger number of positions."[61] That, of course, is true, but only because Lockhart would now elect two council members every year instead of two commissioners every other year, and my colleagues do not say why they believe minority voting power is thereby reduced from the pre-charter level. Nor do they comment on the possibility—which draws support from evidence in this case—that by increasing the number of seats on the governing body, the new charter may offer minorities a more effective role in the selection of its membership than they had before.

From my standpoint, the focus on numbered council seats narrows to this. In pre-charter days, Lockhart's voters elected two members of its governing body in even-numbered years from candidates declaring their aspirations for a specific seat. Under the charter, exactly the same thing will also occur in odd-numbered years. Lockhart's voters would go to the polls twice as frequently to ballot on council membership, but the voting strength of Lockhart's minorities, whether or not enhanced, would not be diminished one whit. Every year, as a councilmanic election in Lockhart approaches, minorities would occupy the same relative position they formerly did in every alternate year—perhaps no stronger, but certainly no weaker. The unmistakable thrust of *Beer* is that Section 5's ban is directed exclusively toward those changes that inaugurate *new* discriminatory practices destructive of gains already achieved in minority political participation, not at changes leaving the situation essentially as it was.[62] In my view, the fact that the two new council seats are numbered posts "can hardly have the 'effect' of diluting or abridging the right to vote ... within the meaning of § 5."[63]

### C. *The Staggered Terms:*

As mentioned previously, there is also objection to the home-rule charter's inauguration of staggered terms. This is a concomitant of the charter's mandate for elections of the city's two new council members in odd-numbered years rather than at the same time its three other officers are chosen. In condemning these facets of the charter, my colleagues speak of the "synergistic discriminatory effect" of the two new numbered posts conjoined with the provision for staggered terms.[64] I have already explained my thesis that numbering of the two new council seats is not a procedure that could lead to a retrogression of minority voting power in Lockhart.[65] The question now is whether the staggering, in pairs, of the terms of those occupying the old and the new seats on the city's governing body will have the effect—either alone or together with the numbering of those seats—of decreasing the "ability of minority groups to participate in the political process and to elect their choices to office."[66] I conclude that in Lockhart's circumstances it will not.

I would agree that a municipality changing from (a) an at-large election every other year to fill four unnumbered council seats to (b) an election every year to fill two of the seats could not preclear under Section 5 because the halving of opportunity for single-shot voting would correspondingly diminish the voting power of minorities.[67] But that is not the situation here, for Lockhart has never had more than two non-may-

---

**61.** See Maj.Op. at 587.

**62.** See *Beer v. United States, supra* note 1, 425 U.S. at 140–141, 96 S.Ct. at 1363–1364, 47 L.Ed.2d at 638–639.

**63.** *Beer v. United States, supra* note 1, 425 U.S. at 141, 96 S.Ct. at 1364, 47 L.Ed.2d at 639.

**64.** Maj.Op. at 588.

**65.** See Part II(B) *supra.*

**66.** *Beer v. United States, supra* note 1, 425 U.S. at 141, 96 S.Ct. at 1363, 47 L.Ed.2d at 639.

**67.** See Part II(B) *supra.*

oral seats as objects in any election. The only change the charter will make is the holding of elections in odd-numbered years for the two new numbered seats on the council. When contrasted with the pre-charter elections biennially to fill the only two numbered seats on the city's governing body, it becomes immediately apparent that all that will occur is repetition of the pre-charter process of choosing two members—now every year instead of every other year. Put another way, each councilmanic election in Lockhart would involve two numbered seats just as before, the only difference being that elections will occur annually rather than biennially.

To be sure, Lockhart's new charter does not enable minorities to cast single-shot votes and thereby increase their influence at the polls.[68] But it is too late in the day to contend that the Voting Rights Act requires the city to find and implement ways to maximize the political strength or representation of its minority citizens.[69] The pivotal consideration here is that while minorities cannot—because council seats are numbered—resort to single-shot balloting in councilmanic elections, the stark fact is that they never could, for the non-mayoral seats have always been numbered. And it seems obvious that the charter provision for elections to the two new council seats in odd-numbered years—and its accompaniment, the staggering of terms—will tend no more to highlight racial identities of candidates for those seats than did the pre-charter practice of filling the two original seats through elections in even-numbered years. The election procedures for both pairs of seats are identical, and no diminution in minority voting power is discernible.

Under the binding authority of *Beer,* then, I conclude that the numbered-post and staggered-term features of Lockhart's proposed scheme of councilmanic elections will not have the effect of denying or abridging the right to vote within the proscription of Section 5.[70] Accordingly, I would not deny Section 5 preclearance on the basis of either. Rather, since we bifurcated the trial of this case[71]—limiting the evidence to the effect of the contested charter provisions on the voting power of Lockhart minorities—I would reopen the proceedings to afford the parties the opportunity to submit additional evidence bearing upon the question whether the city may have had a discriminatory purpose in adopting them.

---

**68.** See Part II(B) *supra.*

**69.** See, *e.g., Beer v. United States, supra* note 1, 425 U.S. at 141, 96 S.Ct. at 1363–1364, 47 L.Ed.2d at 639; *City of Richmond v. United States,* 422 U.S. 358, 370–372, 95 S.Ct. 2296, 2303–2304, 45 L.Ed.2d 245, 256–257 (1975); *Gilbert v. Sterrett,* 509 F.2d 1389, 1394 (5th Cir.), *cert. denied,* 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975); *Cousins v. City Council of the City of Chicago,* 503 F.2d 912, 920 (7th Cir.1974), *cert. denied sub nom. Rayner v. City Council of City of Chicago,* 420 U.S. 992, 95 S.Ct. 1429, 43 L.Ed.2d 674 (1975); *Turner v. McKeithen,* 490 F.2d 191, 197 (5th Cir.1973).

**70.** I am mindful that even "an ameliorative new" voting procedure will "violate § 5 [if] the new [procedure] itself so discriminates on the basis of race or color as to violate the Constitution." *Beer v. United States, supra* note 1, 425 U.S. at 141, 96 S.Ct. at 1364, 47 L.Ed.2d at 639. See also *id.* at 142 n. 14, 96 S.Ct. at 1364 n. 14, 47 L.Ed.2d at 640 n. 14. No one has suggested in this litigation that either the numbered council seats or the staggered terms of members could accomplish so much.

**71.** See note 37 *supra.*